**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

SEKETHA WONZER and KEVIN DOZIER,

                          Plaintiffs,

           -against-

DANIEL HERNANDEZ a/k/a Tekashi 6ix
9ine,

                         Defendant.

-------------------------------------------------------------X

                           **REPORT &**
                          **RECOMMENDATION**

           **20-CV-10836 (JPC) (JW)**

**TO THE HONORABLE JOHN P. CRONAN, U.S.D.J.:**

      Before the Court is a referral for a damages inquest as to defaulting Defendant Daniel Hernandez a/k/a Tekashi 6ix 9ine.  For the following reasons, the Court respectfully recommends that Plaintiffs Seketha Wonzer ("Wonzer") and Kevin Dozier ("Dozier," together the "Plaintiffs") be awarded compensatory and punitive damages, and Dozier be awarded treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO").

## BACKGROUND

### A. Procedural History

      Plaintiffs commenced this action by filing a complaint on December 22, 2020. Dkt. No. 1.  Defendant did not answer or otherwise respond to Plaintiffs' complaint. On May 14, 2021, Plaintiffs filed a motion for default judgment.  Dkt. No. 23.  On June 11, 2021, Defendant's counsel filed a declaration stating the default was not willful, but Defendant would not burden the Court with an opposition to Plaintiffs'

motion given Defendant's allocution in <u>United States of America v. Daniel Hernandez</u>, 18-CR-834 (PAE) (S.D.N.Y. Dec. 20, 2019).

On June 22, 2021, Judge Cronan granted Plaintiffs' motion for default judgment in favor of Plaintiffs as to liability for all causes of action: two violations of RICO, 18 U.S.C. § 1962(c) and (d); assault; battery; false imprisonment; and intentional infliction of emotional distress.  Dkt. No. 29.  Judge Cronan referred the case to Judge Fox for an inquest on damages, pre-judgment interest, attorneys' fees, and expenses, including the handling of discovery in connection with that inquest. <u>Id</u>.  Judge Fox subsequently ordered Plaintiffs to file proposed findings of fact and conclusions of law and an inquest memorandum of law accompanied by supporting affidavits and exhibits to support proof of damages, and Defendant to file opposing submissions thereafter.  Dkt. No. 32.  On February 1, 2022, the matter was reassigned to this Court.

On February 10, 2022, Plaintiffs filed their Inquest Memorandum (Dkt. No. 49), Proposed Findings of Fact and Conclusions of Law ("Proposed Findings") (Dkt. No. 50), and Declaration of Matthew G. DeOreo in Support of Inquest.  Dkt. No. 51. On March 11, 2022, Defendant filed Opposing Findings of Facts and Conclusions of Law (Dkt. No. 64) and a Declaration of Robert S. Meloni with accompanying exhibits. Dkt. No. 65.   On April 21, 2022, Plaintiffs filed a letter submitting "recently discovered evidence" "relat[ing] to the issue of punitive damages" in support of their inquest submissions.  Dkt. No. 67.  The same day, Defendant filed a letter opposing such submission.  Dkt. No. 68.

B. **Factual Background**

On April 3, 2018, Plaintiffs were victims of an armed robbery in the vestibule of a building in New York City.  Compl. ¶ 11.  Defendant videotaped the incident from a car outside the building.  Id. ¶ 15.  The men who robbed Plaintiffs stole Wonzer's backpack, which contained six hard drives of business material, a video camera, and shoes.  Id. ¶ 18.  They also stole approximately $1,500 in cash and a gold chain from Dozier.  Id. ¶ 19.  On January 23, 2019, Defendant was charged with nine federal charges, including RICO violations.  Id. ¶ 21.  Counts 3, 4, and 5 of the indictment concern the robbery of Plaintiffs.  Hernandez, 18-CR-834 (PAE) (S.D.N.Y. Nov. 28, 2018).  Defendant pled guilty to all charges.  Compl. ¶ 22.  Plaintiffs allege they suffer from post-traumatic stress disorder ("PTSD") caused by the robbery.  Dkt. No. 50 ¶¶ 28, 41.  Dozier also states he suffers from depression and major depressive disorder due to the robbery.  Id. ¶¶ 44, 50.[1]

## DISCUSSION

A. **Applicable Legal Standards**

A "default is an admission of all well-pleaded allegations against the defaulting party."  Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004).  "There is no question that a default judgment establishes liability."  Bambu Sales, Inc. v. Ozak Trading, Inc., 58 F.3d 849, 854 (2d Cir. 1995).  A default judgment does not, however, address damages.  Thus, when conducting a damages inquest, all factual allegations of the complaint are accepted as true, except those pertaining to

---

[1] Plaintiffs do not discuss Dozier's major depressive disorder but incorporate this diagnosis by reference to Dr. Deneen's evaluation of Dozier in their Proposed Findings.

damages.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 64-65 (2d Cir. 1981).
"The court must determine the amount of damages, actual or statutory, that may be
assessed."  Santillan v. Henao, 822 F. Supp. 2d 284, 290 (E.D.N.Y. 2011).  "The court
must also ensure that there is a reasonable basis for the damages specified in a
default judgment."  Id.

To support a claim for damages, "[a] plaintiff must therefore substantiate a
claim with evidence to prove the extent of damages."  Almanzar v. 1342 St. Nicholas
Avenue Restaurant Corp., No. 14-CV-07850 (VEC) (DF), 2016 WL 8650464, at *4
(S.D.N.Y. Nov. 7, 2016) (citing Trehan v. Von Tarkanyi, 63 B.R. 1001, 1008 n.12
(S.D.N.Y. 1986).  The plaintiff "must introduce sufficient evidence to establish the
amount of damages with reasonable certainty."  RGI Brands LLC v. Cognac Brisset-
Aurige, S.A.R.L., No. 12-CV-01369 (LGS) (AJP), 2013 WL 1668206, at *6 (S.D.N.Y.
Apr. 18, 2013).  "The plaintiff is entitled to all reasonable inferences from the evidence
it presents."  U.S. ex rel. Nat. Dev. & Const. Corp. v. U.S. Envtl. Universal Servs.
Inc., No. 11-CV-00730 (CS) (PED), 2014 WL 4652712, at *3 (S.D.N.Y. Sept. 2, 2014).
"If a plaintiff fails to demonstrate its damages to a reasonable certainty, the court
should decline to award any damages, even though liability has been established
through default."  McLaughlin v. Barron, No. 13-CV-0807 (NSR) (PED), 2018 WL
1872535, at *3 (S.D.N.Y. Jan. 24, 2018), report and recommendation adopted, 2018
WL 993627 (S.D.N.Y. Feb. 20, 2018).

"Because compensatory damages are 'intended to redress the concrete loss that
the plaintiff has suffered by reason of the defendant's wrongful act,' courts will not

permit recovery when the connection between the claimed loss and the tortious act is speculative or uncertain." Anderson Group, LLC v. City of Saratoga Springs, 805 F.3d 34, 52 (2d Cir. 2015) (internal citation omitted). "[P]laintiff bears the burden of showing that the claimed damages are the 'certain result of the wrong.'" Id. at 52-53 (citing Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 562 (1931)). "Because the purpose of compensatory damages is to compensate the plaintiff for an injury caused by a defendant, one principle of causation is that the defendant's conduct be a 'but for' cause of plaintiff's injuries." Meyers v. Epstein, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003) (internal citation omitted). "In addition to 'but for' causation, the plaintiff must prove his or her losses were proximately caused by defendant's actions." Id. (internal citations omitted). See also Gibeau v. Nellis, 18 F.3d 107, 110 (2d Cir. 1994) (holding that compensatory damages were not required as a matter of law where the evidence was ambiguous as to the cause of injuries).

While a hearing *may* be held on the issue of damages, the Federal Rules of Civil Procedure "leave[] the decision of whether a hearing is necessary to the discretion of the district court." Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); accord Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991); Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993).

**B. <u>Determination of Damages</u>**

1. <u>Compensatory Damages</u>

Since cases involving damages following a robbery are infrequent, the Court looked to awards given for emotional damages in cases involving other causes of

action.  A useful framework for analyzing emotional distress claims is found in the employment discrimination context where claims are categorized into three types— "garden variety," "significant," and "egregious."  See Olsen v. County of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009); Khan v. HIP Centralized Lab. Servs., Inc., No. 03-CV-2411 (DGT), 2008 WL 4283348, at *10 (E.D.N.Y. Sept. 17, 2008); Rainone v. Potter, 388 F. Supp. 2d 120, 122-23 (E.D.N.Y. 2005) (citing Michelle Cucuzza, Evaluating Emotional Distress Damage Awards to Promote Settlement of Employment Discrimination Claims in the Second Circuit, 65 Brook. L. Rev. 393, 427-28 (1999)).  This framework has also been used to analyze emotional distress claims under 42 U.S.C. § 1983.  See Thorsen v. County of Nassau, 722 F. Supp. 2d 277, 291-92 (E.D.N.Y. 2010).  Additionally, the analysis is similar to that used in emotional distress cases under New York law, which differentiate between garden variety emotional distress claims that do not require medical attention and more complex claims resulting in a psychiatric injury.  See Jessamy v. Ehren, 153 F. Supp. 2d 398, 401 (S.D.N.Y. 2001).

In garden variety claims, the evidence of emotional harm "is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms."  Khan, 2008 WL 4283348, at *11.  Awards range from $30,000 to $125,000. See Francis v. City of New York, No. 15-CV-7997 (VSB) (KHP), 2019 WL 8918743, at *8 (S.D.N.Y. Nov. 12, 2019).  See also MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012) (collecting cases); Kerman v. City of New York, 374 F.3d 93, 124 (2d Cir. 2004) (jury correctly rejected plaintiff's claim for emotional

suffering and psychological injuries because plaintiff's psychiatrist's expert opinion "was not sufficiently specific to link" plaintiff's PTSD to defendants' conduct at issue).

In contrast, "significant" emotional distress claims "differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." MacMillan, 873 F. Supp. 2d at 560. Awards for "significant" claims "'usually range from $50,000.00 to $200,000.00.'" Sooroojballie v. Port Authority of New York & New Jersey, 816 Fed. App'x 536, 547 (2d Cir. 2020). "Finally, 'egregious' emotional distress claims 'generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff.'" Olsen, 615 F. Supp. 2d at 47 (quoting Khan, 2008 WL 4283348, at *12). Awards at the high end of the spectrum may be warranted "in cases that generally contain evidence of debilitating and permanent alterations in lifestyle." Rainone, 388 F. Supp. 2d at 124.

As will be demonstrated below, the Court finds Plaintiffs' cases as to compensatory damages inapplicable. None of Plaintiffs' cases involved awards following default judgments. See e.g., McKithen v. City of New York, 292 A.D.2d 352 (2d Dep't 2002) (plaintiff was awarded compensatory damages at trial after her husband stabbed her where there was no dispute as to plaintiff's emotional injuries and their cause). Here, however, the parties and their experts dispute Plaintiffs' injuries due to the robbery, the cause of Plaintiffs' alleged injuries, and the long-term

effects of the robbery on Plaintiffs.   The robbery was also a rather brief event; Plaintiffs were not exposed over time to the incident at issue like the individuals in many of Plaintiffs' cases were.   See e.g., Kondracke v. Blue, 277 A.D.2d 953, 954 (4th Dep't 2000) (petitioners suffered injuries due to harassment and discrimination they endured over several months); McKay v. Ciani, 288 A.D.2d 587 (3d Dep't 2001) (plaintiff suffered emotional injuries from a long-term sexual relationship with her former substance abuse counselor).

    a.  Plaintiff Wonzer

       i.  Relevant Mental Health History[2]

From 2013 to 2017, Wonzer was diagnosed with and treated for anxiety and insomnia.   Dkt. No. 66-2 at 4.   On April 3, 2018, the robbery at issue took place.   Dkt. No. 49 at 1.   On April 24, 2018, three weeks after the robbery, Dr. Lynda Mbah, who Wonzer had been seeing for years prior to the robbery, evaluated Wonzer and found her mood and affect to be "pleasant."  Dkt. No. 66-2 at 5.   Dr. Mbah gave Wonzer a Patient Health Questionnaire-2 ("PHQ-2")[3], which revealed that she did not have Major Depressive Disorder.   Id. at 5.   On August 6, 2018, Wonzer saw Dr. Mbah and reported low energy and requested a psychiatric referral for anxiety, "though this was not further assessed."  Id.   On September 11, 2018, Wonzer saw Dr. Mbah for weight

---

[2] "[T]he plaintiff bears the burden of showing that the claimed damages are the 'certain result of the wrong.'" Anderson Group, LLC, 805 F.3d at 52-53.   "Once the plaintiff meets this burden, the defendant then bears the risk of uncertainty as to the amount of damages."  Id. at 53.   Plaintiffs did not provide copies of their medical records and instead relied solely on Plaintiffs' declarations and their expert's reports and diagnoses.   Plaintiffs' expert's reports contain a limited and incomplete summary of Plaintiffs' medical records.   The Court's recitation of Plaintiffs' relevant mental health history is thus based on the more detailed summary of Plaintiffs' medical records by Defendant's expert, Dr. Dinwiddie.

[3] PHQ-2 "is considered a rapid, 'first-step' screening tool to identify cases of Major Depressive Disorder . . . ."  Dkt. No. 66-2 at 5, n.2.

management.  Dr. Mbah described Wonzer's mood and affect as "pleasant" and did not note any depressive symptoms.  Id.

At the end of November 2018, Wonzer's husband was shot and killed.  Dkt. No. 51-12 ¶ 13.  On December 25, 2018, Wonzer was psychiatrically admitted to the Medical Center of McKinney after threatening to commit suicide.  Dkt. No. 66-2 at 5. While admitted, Wonzer yelled at multiple staff members and police and threatened harm to staff members.  Dr. Zainab Zia diagnosed Wonzer with Bipolar I disorder. Id. at 5-6.  On December 26, 2018, while still admitted, Wonzer reported that she had a similar episode ten years earlier after her sister's death.  Dr. Zia noted that Wonzer "remain[ed] irritable, demanding to be discharged, claiming she has the right to grieve over the loss of her husband."  Id. at 6.  Before being released on December 28, 2018, Wonzer's mother told a case worker that Wonzer had been "psychotic before" when her sister died and her husband's death the month prior was weighing on Wonzer.  Id. at 5-6.  On February 7, 2019, Dr. Mbah described Wonzer's mood and affect as "pleasant," but she also diagnosed Wonzer with Recurrent Episode of Major Depressive Disorder, moderate.  Id. at 7.  On September 3, 2019, Dr. Mbah noted that Wonzer complained of "mood depression occasionally" and began taking Seroquel to help stabilize her mood after her husband's death.  Wonzer's PHQ-2 score was not positive for Major Depressive Disorder.  Id.

In January 2020, Wonzer admitted she exaggerated the amount of Tylenol she took the night before to "emphasize the severity of her" headache and nausea.  Id.  In February 2020, Wonzer was diagnosed with PTSD and bereavement after she

recounted the aftermath of the robbery and her husband's death.  Id.  Wonzer stated she became scared of everything and could not work after the robbery, and she attempted suicide after her husband was killed.  Id.  On March 17, 2020, Dr. Mbah noted that Wonzer was "doing well overall" and did not record any psychiatric symptoms.  Id. at 8.  On April 14, 2020, Wonzer told Dr. Mbah that she had had anxiety and difficulty falling asleep since the robbery.  Id.

On September 3, 2020, Wonzer told another doctor, Dr. Bashir Ahmed, that her life had been "wonderful" until she was robbed at gunpoint by five men and assaulted during that time.  Then, her husband died and Wonzer said she had felt depressed ever since.  Id.  Wonzer reported nightmares since the robbery and stated she had anxiety, trust issues, and paranoia, and was hypervigilant.  Id.  Dr. Ahmed diagnosed Wonzer with PTSD, chronic, and Major Depressive Disorder, recurrent, severe without psychotic features.  Id.  Wonzer scored high on tests for depression and anxiety on September 6, 2020.  Id. at 9.  On September 10, 2020, Wonzer was evaluated for a "crisis assessment."  Id. at 9.  Wonzer stated that Defendant robbed her and then her husband was killed, and reported severe depression and anxiety as well as crying spells.  Wonzer reported that "she has been in a dark place" since the robbery when she was sexually assaulted and has multiple flashbacks.  Id.  However, she answered in the negative to questions on a PTSD screening test.  Id. at 10.

On September 16, 2020, Wonzer saw Advanced Practice Nurse Vanessa Brimigion and reported that her anxiety and depression began in 2018 after the robbery and rainbow-colored hair triggered her memories of the assault.  Brimigion

diagnosed Wonzer with Bipolar type II, PTSD, and Generalized Anxiety Disorder.  Id. at 11.  Wonzer saw Dr. Ahmed the next day and reported nightmares and difficulty falling asleep.  Id.  During therapy visits on September 16, 2020 and October 9, 2020, no specific PTSD symptoms were recorded in Wonzer's records.  On October 13, 2020, Wonzer told Brimigion that her depression and anxiety were a 9 out of 10 and that she was hearing voices in her head.  Id. at 12.

On November 12, 2020, Wonzer told therapist Daylle Taylor that she was feeling "so much better" until her friend was murdered days prior.  On December 4, 2020, Wonzer reported being worried about money and catching "the virus."  Id.  By March 2021, Wonzer reported she was "doing great" and had "almost no anxiety" "when doing a concert."  Id.  In May 2021, Wonzer stated she was stressed knowing Defendant would be near her at a concert.  Id. at 13.  From July 2021 to December 2021, Wonzer stated she was depressed and anxious due to her financial situation, family issues and her husband's death.  Id. at 13-14.

## ii.  Expert Opinions

Dr. Deneen, Plaintiffs' expert, who examined Wonzer once on January 17, 2022 and at least partially reviewed Wonzer's medical records, concluded the following:

> Based on the findings in her reported history and current symptomology, and with a reasonable degree of psychological certainty, [Wonzer's] PTSD diagnosis has a causal relationship to the 04/03/2018 incident.  Ms. Wonzer's depressive diagnosis is also retained based on her psychological history.  Ms. Wonzer's diagnosis of PTSD is significant and may in some circumstances last many years and could be a permanent condition, therefore necessitating treatment.

Dkt. No. 52-1 at 5.

11

Defendant's expert, Dr. Dinwiddie, did not examine Wonzer but reviewed Dr. Deneen's report and testing of Wonzer; Wonzer's medical records; Plaintiffs' complaint; Plaintiffs' memorandum of law on damages; Plaintiffs' Proposed Findings; a video of the robbery; excerpts from "Portrait of a Publicist," allegedly written by Wonzer; and an excerpt of an interview with Wonzer reportedly from December 2020. Dkt. No. 66-2 at 2. Dr. Dinwiddie found with a reasonable degree of medical certainty that Wonzer suffers from a form of bipolar illness and an anxiety disorder. Id. at 19-21. However, Dr. Dinwiddie disagreed with Dr. Deneen and concluded that a PTSD diagnosis cannot be established because of the absence of sufficient symptoms in Wonzer's medical records and Dr. Deneen's report. Id. at 24. Dr. Dinwiddie also stated "there is the possibility of misattribution (i.e., the inaccurate attribution of accurately-reported symptoms)" of PTSD symptoms because Wonzer's husband died only eight months after the robbery. Id. at 25.

The Court finds Dr. Deneen's report to be unreliable for two principal reasons. First, the Court certainly understands that Wonzer, as the victim of a terrible crime, may recall the robbery differently after the fact. However, there are clear differences between what Wonzer recalls and the evidentiary record. Therefore, while sympathetic to Wonzer and with no intent of belittling the significance of Wonzer's experience, the Court must base its decision on the facts. Wonzer reported during a crisis assessment that Defendant robbed her and that she was sexually assaulted during the robbery (Dkt. No. 66-2 at 9), but the video of the robbery shows no such assault. Dkt. No. 65-1. Further, Wonzer told Dr. Deneen that she was "ambushed"

12

by five gunmen and could "feel the guns pointed in [her] neck, [her] chest, [her] side." Dkt. No. 52-1 at 2. Yet, the video of the robbery demonstrates no one pointed a gun at Wonzer. Dkt. No 65-1. Wonzer was in the vestibule while the robbery took place for at most 12 seconds. Id. Only one person participating in the robbery had a gun, which was pointed down the entire time, and that person did not approach Wonzer. Id. She also reported Defendant had been harassing her for the last two years (Dkt. No. 66-2 at 9), though there is no evidence of that in the record. Therefore, the Court finds Dr. Deneen's report unreliable because it relies on these factual inconsistencies.

Second, Defendant's conduct must "be a 'but for' cause of [Wonzer's] injuries" and Wonzer "must prove . . . her losses were proximately caused by defendant's actions." Meyers, 282 F. Supp. 2d at154. "Under New York law, any damages recovered must be the direct result of defendant's wrongful acts," (Id.) and Plaintiffs have not proven same. See also Anderson Group, LLC, 805 F.3d at 52 ("[P]laintiff bears the burden of showing that the claimed damages are the 'certain result of the wrong.'") (internal citation omitted); Gibeau, 18 F.3d at 110 (holding that compensatory damages were not required as a matter of law where the evidence was ambiguous as to the cause of injuries).

Dr. Deneen concludes that the robbery caused Wonzer's PTSD without addressing Wonzer's husband's death. The death is a clear intervening event in the line of causation between the robbery and Wonzer's PTSD diagnoses. Dr. Deneen acknowledges this in his recitation of his evaluation of Wonzer and her medical records. As a result, the Court does not find Dr. Deneen's expert report reliable. See

Tardif v. City of New York, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) (finding expert's report unreliable because expert "fail[ed] to explain the basis for his conclusion that [d]efendants' conduct, and not other traumatic experiences in [plaintiff's] life, caused her current injuries."); Rhone v. United States, No. 04-CV-5037 (PKL), 2007 WL 3340836, at *6 (S.D.N.Y. Nov. 9, 2007) ("[E]ven where there is objective medical proof [of a serious injury], when additional contributory factors interrupt the chain of causation between the accident and claimed injury-such as a gap in treatment, an intervening medical problem or a preexisting condition-summary dismissal of the complaint may be appropriate.") (internal citation omitted). See also Carter v. Full Service, Inc., 29 A.D.3d 342, 344 (1st Dep't 2006) ("[I]n the absence of an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's 'conclusion that plaintiff's condition is causally related to the subject accident is mere speculation' insufficient to support a finding that such a causal link exists.").

   iii.   <u>Damages</u>

Not only is the cause of Wonzer's PTSD unclear, the Court also questions the long-term effects of Wonzer's PTSD diagnosis. Wonzer told Dr. Deneen she can complete daily activities, such as cooking, cleaning, doing the laundry, and grocery shopping. She can drive and manage her own income, unassisted. She has a "wonderful support system" of friends and family, and was employed until January 2020, when she left her job as a waitress "due to the Covid pandemic." Dkt. No. 52-1 at 3. Plaintiff does not state her current unemployment is due to the robbery. Yet,

Dr. Deneen's report does not evaluate these statements before stating that Wonzer's PTSD diagnosis is potentially permanent.

Plaintiffs, like Dr. Deneen, made no attempt to assess the impact of Wonzer's husband's death on Wonzer's PTSD diagnoses. Despite seeing medical providers consistently after the April 3, 2018 robbery, Wonzer did not discuss the robbery until February 10, 2020. Dkt. No. 66-2 at 7. Instead, during her visits before February 10, 2020, Wonzer mentioned her husband's death and its impact on her. Id. at 5-7. On February 12, 2020; September 3, 2020; and September 10, 2020, all after Wonzer's husband's death, Wonzer was diagnosed with PTSD. Id. at 7, 8, and 10. During those medical visits, Wonzer discussed her symptoms in the context of the robbery and her husband's death. Wonzer's diagnoses do not state whether her PTSD is due to the robbery or her husband's death, or a combination of the two.

Accordingly, the Court is unable to determine whether the robbery actually caused Wonzer's alleged injuries. See Cunningham v. McCluskeym, No. 05-CV-10169 (DAB), 2011 WL 3478312, at *2 (S.D.N.Y. Aug. 8, 2011) (holding that plaintiff's claim for damages from being held in custody was without merit because "Plaintiff's unprovoked, independent, and unforeseeable decision to run into the road while handcuffed was a superceding [sic] cause of his injuries"); Anderson Group, LLC, 805 F.3d at 52 ("[P]laintiff bears the burden of showing that the claimed damages are the 'certain result of the wrong.'") (internal citation omitted); Gibeau, 18 F.3d at 110 (holding that compensatory damages were not required as a matter of law where the evidence was ambiguous as to the cause of injuries); Estate of Ratcliffe v. Pradera

Realty Co., No. 05-CV-10272 (JFK), 2008 WL 53115, at *6 (S.D.N.Y. Jan. 2, 2008); (holding that where plaintiffs failed to account for other factors that could have caused the accident at issue, a jury's finding that one factor caused the accident at issue "would amount to speculation").

The Court thus finds that Wonzer's damages are akin to the garden variety cases Defendant cites. For instance, in Fowler v. New York Transit Auth., No. 96-CV-6796 (JGK), 2001 WL 83228, at *14 (S.D.N.Y. Jan. 31, 2001), the court reduced compensatory damages from $50,000 to $25,000. Plaintiff's testimony regarding her emotional distress and headaches was corroborated to a degree by her treating providers. However, the treating providers' opinions relied on plaintiff's representations and there was evidence that other factors contributed to plaintiff's injuries aside from defendants' conduct. See also Manson v. Friedberg, No. 08-CV-3890 (RO), 2013 WL 2896971, at *8 (S.D.N.Y. June 13, 2013) (awarding $10,000 in compensatory damages because plaintiff's testimony as to emotional distress from sexual harassment was "vague and conclusory," and did not "address the severity or duration of her emotional distress"); Joseph v. HDMJ Rest. Inc., 970 F. Supp. 2d 131, 153-54 (E.D.N.Y. 2013) (awarding $30,000 in compensatory damages for emotional distress based on plaintiff's Title VII claims where plaintiff's allegations of emotional distress were significant but "stated as conclusions by the [p]laintiff herself"); White-Ruiz v. City of New York, 983 F. Supp. 365, 394-95 (S.D.N.Y. 1997) (awarding plaintiff damages for emotional distress caused by defendants' misconduct but declining to award damages for emotional distress suffered after and unrelated to defendants'

misconduct).   The Court thus respectfully recommends an award of $15,000 to Wonzer in compensatory damages.

Lastly, Wonzer's request for leave to seek an amendment of this judgment once her counsel has negotiated her Medicare lien is denied.   Plaintiffs' cases awarding such a lien are factually distinct because, here, there are questions as to whether Wonzer's alleged injuries are due to the robbery and questions about the extent of Wonzer's injuries.   See Chandanais v. Ryan, No. 2009-2998, 2010 WL 3358694 (Sup. Ct. Broome Cnty. Aug. 18, 2010) (parties did not dispute that lien arose from care for injuries resulting from incident at issue); Wang v. Li, No. 2010-101382, 2013 WL 6219009 (Sup. Ct. N.Y. Cnty. Apr. 3, 2013) (same); Schwartz v. Richman, No. 1715/01, 2004 WL 5916880 (Sup. Ct. Queens Cnty. Aug. 27, 2004) (parties stipulated to lien); Mejia ex rel Ramirez v. City of New York ex rel. Hum. Res. Admin., No. 01-CV-3381 (GBD), 2004 WL 2884407, at *1 (S.D.N.Y. Dec. 10, 2004) (same).   In the absence of any clear and compelling evidence that any ongoing treatment would be caused by or even related to the robbery, the Court does not find a lien to be warranted.

  b.   Plaintiff Dozier

    i.   Relevant Mental Health History

Dozier was diagnosed with depression in 2008.   Dkt. No. 52-2 at 5.   In December 2019, over a year and a half after the robbery, Dozier was first diagnosed with PTSD after reporting he was "stressed out" from the robbery.   Dkt. No. 66-1 at 3.   In January 2020, Dozier reported nightmares, poor sleep and concentration, low mood and energy, and hypervigilance.   He stated his symptoms worsened after learning that "the person involved in the assault lives a few blocks from him."   Id. at

5.  Dr. Irina Kogan diagnosed Dozier with PTSD again and Generalized Anxiety Disorder.  Id. at 7.

On February 14, 2020, Dozier reported no nightmares and good sleep, a "mildly anxious mood," and no panic attacks or excessive worry.  Dr. Kogan noted diagnoses of PTSD and Generalized Anxiety Disorder.  Id. at 8.  On February 20, 2020, Dozier saw Dr. Alexander Maksymenko for psychotherapy.  Dozier discussed the robbery and described his nightmares and flashbacks, severe anxiety, and fear of death.  Id.  Six days later, Dozier told Dr. Kogan he was "doing well overall," with improved sleep and mood.  Dozier denied Major Depressive Disorder symptoms (Id.), despite Dr. Deneen's later diagnosis of same.  Dkt. No. 52-2 at 5.  On February 28, 2020, Dr. Maksymenko described Dozier as "anxious and a bit tense," but his affect was "brighter and more reactive."  Dkt. No. 66-1 at 9.  Dr. Maksymenko did not mention specific symptoms of PTSD or Generalized Anxiety Disorder.  Id.

In March 2020, Dozier told Dr. Maksymenko that he constantly watched the online video of the robbery and had concerns over the coronavirus, anxiety, flashbacks, and nightmares.  Id.  Dozier also saw Dr. Kogan, who described Dozier's mood as stable, and stated that Dozier reported "doing better overall" and denied having nightmares or flashbacks or feeling depressed.  Dr. Kogan noted that Dozier's "care will be transferred to a drug treatment program due to ongoing substance use." Id.  From April to December 2020, Dozier sometimes reported anxiety, nightmares, and flashbacks, and at other times denied such symptoms.  Dozier also discussed issues unrelated to the robbery during his medical visits, such as his home situation

and family losses.  Id. at 9-11.  Specifically, on September 3, 2020, Dr. Maksymenko noted that "it was hard to say" whether Dozier's anxiety was due to his current home situation or a traumatic past event.  Id.  From January to June 2021, Dozier reported feeling better and denied flashbacks or nightmares.  Id. at 11-12.

ii. <u>Expert Opinions</u>

Dr. Deneen, Plaintiffs' expert, examined Dozier once on January 17, 2022 and concluded the following after reviewing at least part of Dozier's medical records:

> With a reasonable degree of psychological certainty, the onset of [Dozier's] psychological conditions and his diagnoses of PTSD and major depressive disorder, demonstrates a causal relationship to Mr. Dozier's 04/03/2018 incident, as well as significant exacerbation of his depression as a result of this incident.  Mr. Dozier's PTSD and related psychological conditions in some cases may last many years and could be permanent, clearly necessitating treatment.

Dkt. No. 52-2 at 5.

Defendant's expert, Dr. Dinwiddie, did not examine Dozier but reviewed Dr. Deneen's report and testing of Dozier; Dozier's medical records; Plaintiffs' complaint; Plaintiffs' memorandum of law on damages; Plaintiffs' Proposed Findings; a video and description of the robbery; and excerpts from "Terror of Tekashi 6ix9ine," allegedly written by Dozier.  Dkt. No. 66-1 at 1.  Dr. Dinwiddie disagreed with Dr. Deneen and concluded that neither a PTSD diagnosis nor a Major Depressive Disorder diagnosis can be substantiated.  Id. at 14, 15.  "[W]hile Dr. Deneen concluded that onset of [PTSD] symptoms was at some point 'after' the [robbery], the temporal relationship between the events and first appearance of symptoms is not further specified, thus potentially undermining any conclusions as to causation."  Id. at 15.

19

Dr. Dinwiddie also found that Dozier's "psychological testing [with Dr. Deneen] appear broadly inconstant with treatment records." Id.

The Court finds that Dr. Deneen's evaluation raises more questions than it answers. Dozier's responses to the Minnesota Multiphasic Personality Inventory revealed "scales sensitive to exaggeration of psychiatric, cognitive, and bodily complaints fell in the non-credible range." Dkt. No. 52-2 at 4. Dozier's responses to the Trauma Symptom Inventory test yielded "[s]ignificant elevations" in intrusive experiences, suicidal ideation, anxious arousal, and depression scales. Id. However, such results stand in sharp contrast to Dozier's stated symptoms to his treating doctors in the months prior when he reported feeling much better. See Dkt. No. 66-1 at 11-12.

In addition, the Court again certainly understands that victims of a crime may feel that the crime lasted longer than it did or recall the crime differently after the fact. However, given the documentary evidence of the crime in this case, the Court must base its decision on the facts. Dozier told Dr. Deneen the robbery lasted two to three minutes (Dkt. No. 52-2 at 1), and the robbers put "a gun to [his] stomach" and "had guns and machetes." Dkt. No. 66-1 at 12. Yet, the video shows the robbery lasted at most 35 seconds and the robbers did not all have guns and machetes. Only one person had a gun, and it was pointed down for the duration of the robbery, not at Dozier's stomach. Dkt. No. 65-1. Therefore, to the extent Dr. Deneen based his evaluation and report of Dozier on such inconsistencies, the Court finds Dr. Deneen's report unreliable. The Court also finds Dr. Deneen's report unreliable because while

Dr. Deneen acknowledges Dozier's pre-existing depression, which was first diagnosed in 2008, he does not explain how the robbery exacerbated this condition.

### iii.  <u>Damages</u>

Plaintiffs allege that the robbery caused Dozier's depression.  Dkt. No. 50 at 13.  Significantly, however, Dozier was diagnosed with depression in 2008.  Dkt. No. 52-2 at 2.  Plaintiffs do not plead Dozier's diagnosis or exacerbation of Dozier's depression in their Complaint.  Additionally, Plaintiffs' Proposed Findings include a quote from Dr. Deneen's report stating that the robbery exacerbated Dozier's depression but otherwise do not explain how the robbery exacerbated Dozier's depression.  Accordingly, the Court finds that there is insufficient evidence to support Plaintiffs' claim that the robbery caused or exacerbated Dozier's depression.  <u>See</u> <u>Steadman v. Gov't Emp. Ins. Co.</u>, No. 20-CV-1005 (CM), 2020 WL 7060015, at *7 (S.D.N.Y. Dec. 2, 2020) (a plaintiff who claims that an accident aggravated pre-existing conditions must "provide objective evidence that distinguishes aggravation of a pre-existing condition from the pre-existing condition itself"); <u>Maurer v. United States</u>, 668 F.2d 98, 100 (2d Cir. 1981) ("[W]hen a plaintiff is incapacitated or disabled prior to an accident, the defendant is liable only for the additional harm or aggravation that he caused."); <u>Rodgers v. New York City Tr. Auth.</u>, 70 A.D.3d 917, 920 (2d Dep't 2010) ("[A]ggravation of a preexisting injury or condition is an element of damages which must be affirmatively pleaded and proven before recovery can be allowed.");

could not recover on the theory of aggravation of a preexisting condition because plaintiffs did not plead or prove such aggravation).

A reduction of Dozier's damages award is thus warranted to account for the fact that Dozier's preexisting depression either contributed to or caused Dozier's depression following the robbery.  See Carroll v. United States, 295 F. App'x 382, 386 (2d Cir. 2008) (reducing plaintiff's award where plaintiff had a preexisting injury and evidence demonstrated that the conduct at issue was not the sole cause of plaintiff's harm); Dunn v. United States, No. 04-CV-3035 (MDF), 2007 WL 1087204, at *11 (S.D.N.Y. Apr. 11, 2007) (reducing plaintiff's damages for one incident by 25% and another incident by 10% "to reflect the extent to which the [c]ourt has concluded that [p]laintiff's preexisting conditions have contributed to or are the cause of his present damaged condition"); Bick v. City of New York, No. 95-CV-8781 (KMW) (MHD), 1998 WL 190283, at *26 n.21 (S.D.N.Y. Apr. 21, 1998) (directing a new trial on damages unless plaintiff accepted a reduction of damages from $750,000 to $100,000 because "[a]lthough 'it's well settled that aggravation of a pre-existing condition gives rise to liability', in arriving at an equitable compensatory figure, this court has taken into account the fact that plaintiff has suffered through personal adversity, not attributable to the defendants, that undoubtedly contributed to her emotional suffering.") (internal citations omitted).

The long-term effects of the robbery on Dozier are unclear as well.  Dozier's medical records reveal that Dozier's symptoms improved over time.  While Dozier reported various symptoms from the robbery to Dr. Deneen, he also said he "learned

to cope and deal with certain triggers." Dkt. No. 52-2 at 2.  Dozier stated during Dr. Deneen's evaluation that he is unemployed because his foot "got injured" and then "Covid hit," without mentioning the robbery and its impact on his ability to work.  Id. at 3.  Dozier can "manage his finances independently . . . [and] speaks to a few close friends and is close with his aunt."  Id.  Dr. Deneen notes this in his report but does not grapple with these statements when concluding that Dozier's "PTSD and related psychological conditions . . . could be permanent."  Id. at 5.  In fact, in June 2021, Dozier reported to his doctor he was planning on moving to Florida. Dkt. No. 66-1 at 12.

The Court thus concludes that Dozier's claims are akin to the garden-variety cases Defendant cites and respectfully recommends an award of $30,000 to Dozier in compensatory damages.  See Fowler v. New York Transit Auth., No. 96-CV-6796 (JGK), 2001 WL 83228, at *14 (S.D.N.Y. Jan. 31, 2001) (reducing compensatory damages from $50,000 to $25,000 because the treating providers' opinions relied on plaintiff's representations and there was evidence that other factors contributed to plaintiff's injuries aside from defendants' conduct); Manson v. Friedberg, No. 08-CV-3890 (RO), 2013 WL 2896971, at *8 (S.D.N.Y. June 13, 2013) (awarding $10,000 in compensatory damages because plaintiff's testimony as to emotional distress from sexual harassment was "vague and conclusory," and did not "address the severity or duration of her emotional distress"); Joseph v. HDMJ Rest. Inc., 970 F. Supp. 2d 131, 153-54 (E.D.N.Y. 2013) (awarding $30,000 in compensatory damages for emotional distress based on plaintiff's Title VII claims where plaintiff's allegations of emotional

distress were significant but "stated as conclusions by the [p]laintiff herself"). <u>See also</u> <u>White-Ruiz v. City of New York</u>, 983 F. Supp. 365, 394-95 (S.D.N.Y. 1997) (awarding plaintiff damages for emotional distress caused by defendants' misconduct but declining to award damages for emotional distress suffered after and unrelated to defendants' misconduct).

The Court denies Dozier's request for leave to seek an amendment of this judgment once his counsel has negotiated his Medicaid lien for the same reasons the Court denies Wonzer's request.

2. <u>Punitive Damages</u>

The Supreme Court has identified three factors to consider when assessing the reasonableness of punitive damages: (1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases. <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 575 (1996). No matter how egregious the underlying conduct is, the court must consider the defendant's financial circumstances as well. <u>Patterson v. Balsamico</u>, 440 F.3d 104, 121 (2d Cir. 2006).

As to the first factor – reprehensibility, "a court must consider whether: the harm was physical rather than economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit, or mere accident. It should be presumed that a plaintiff

has been made whole by compensatory damages, so punitive damages should be awarded only if the defendant's culpability is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 409 (2003) (internal citations omitted).

Defendant pled guilty to committing the robbery, which both Plaintiffs allege caused them mental harm and Dozier alleges also caused economic harm.  Robbing Plaintiffs certainly evinced an indifference or reckless disregard to Plaintiffs' health and safety and resulted from more than a mere accident.  However, the robbery was an isolated incident as to Plaintiffs in which Defendant was not physically involved. There is also no evidence in the record to support Plaintiffs' claim that "Defendant caused Plaintiffs to be violently robbed at gunpoint by dangerous gang members." Dkt. No. 49 at 6.  Defendant was outside the building where the robbery took place in a car videotaping the incident.  Dkt. No. 65 ¶ 3.  The record does not indicate Defendant uploaded the video of the robbery to social media, and there is no evidence Defendant took the items seized during the robbery for himself.

Plaintiffs request that the Court consider Defendant's recently released song, entitled Giné, to show Defendant's reprehensibility.  Dkt. No. 67.  Plaintiffs argue the song "disparages Plaintiffs," "brags about the crimes that he committed against them," and "makes statements that could be interpreted by [Defendant's] supporters as a threat to have [Plaintiffs] harmed," among other things.  Id. at 1.  Plaintiffs also point to Defendant's video on Instagram "where [Defendant] brags about being rich and flashes what he claims to be $2 million of cash as well as multiple luxury cars,

watches and jewelry." Id. at 2.  While Plaintiffs acknowledge that Defendant later told the media that the funds were "fictitious," Plaintiffs allege that Defendant's "boast" "further evinces the Defendant's total lack of remorse."  Id.

Even if the Court considered this belated evidence, the Court does not find it to be persuasive evidence of reprehensibility.  Defendant provided articles discussing hip-hop culture, one of which states that "[h]ip-hop is a culture built around machismo and bravado, so backing down or losing a battle is detrimental to an artist's career. . . . Certain MCs have built entire careers around beefing with other artists, while others have had their careers destroyed with just a couple lines."[4]  While luxury goods appear in Defendant's music video, there is no evidence that they are Defendant's.  "Bragging is as much a part of rap music as the self-referential 'ya boy' and inexplicably substituting V's for A's.  The genre's love for unchecked bravado and baseless one-upmanship has created a . . . sinkhole[] worth of ridiculous claims over the years."[5]

As to Giné specifically, Defendant provided online articles stating that the song is a diss track related to other individuals, not Plaintiffs.  Dkt. No. 68 at 1.  Yet, such articles are about the second verse of Giné, not the first verse that Plaintiffs claim is about them.  Still, Plaintiffs have not identified any lyrics in Giné that would lead the Court to believe the song is about Plaintiffs specifically.

---

[4] Andrew Barber and Frazier Tharpe, *The 50 Best Hip-Hop Diss Songs*, COMPLEX (Oct. 31, 2018), https://www.complex.com/music/2018/10/the-50-best-hip-hop-diss-songs/young-jeezy-stay-strapped-2005?msclkid=eeaaea46c25411ecb578297608fa5daa.
[5] *25 Rappers Spitting About Cars They Probably Can't Afford*, COMPLEX (Apr. 4, 2013), https://www.complex.com/sports/2013/04/25-rappers-spitting-about-cars-they-probably-cant-afford/.

The Court does note that Defendant lacks some remorse based on his words in this case.  Defendant states he is "deeply remorseful for any injury the Plaintiffs may have suffered *at the hands of the Nine Trey Gang members* that evening of 4/03/2018." Dkt. No. 65-2 ¶ 21 (emphasis added).  Instead of acknowledging his potential impact on Plaintiffs, Defendant places accountability for the pain and suffering Plaintiffs have endured on others.  The Court gives this only minimal weight.  Lack of remorse is not an element of reprehensibility and Plaintiffs cite no caselaw supporting their interpretation.

As to the second factor – the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award, courts "often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case." Payne v. Jones, 711 F.3d 85, 102 (2d Cir. 2013).  "[I]n cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high." Id.  However, "when compensatory damages are substantial, then an even lesser ratio can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co., 538 U.S. at 410. Plaintiffs request a 9.52 to 1 ratio between punitive and compensatory damages.  This ratio appears high given that the Court has awarded tens of thousands of dollars in compensatory damages while finding that Defendant's reprehensibility is tempered by his lack of physical involvement and connection to the robbery.

Next, the Court turns to the third factor – the difference between the punitive damages awarded and the civil penalties imposed in comparable cases.   Plaintiffs

cite numerous cases to establish the precedent of a 9.52 to 1 ratio of punitive to compensatory damages, all of which are distinguishable.  Here, there is no evidence that Defendant was physically involved in or caused the robbery to take place or that Defendant's conduct causing Plaintiffs' injuries occurred over time.

Yet in Plaintiffs' cases, the defendants were directly involved in and caused the conduct at issue that harmed plaintiffs, and in some instances, defendants' conduct occurred over time.  See Maskantz v. Hayes, 4 Misc. 3d 1030(A), at *2-3 (Sup. Ct. N.Y. Cnty. 2004) (punitive damages award was reasonable where plaintiff made false charges against defendant, which caused defendant to endure "the emotional and financial strain of a criminal prosecution"); Rosenberg, Minc & Armstrong v. Mallilo & Grossman, 8 Misc. 3d 394, 403 (Sup. Ct. N.Y. Cnty. 2005) (individual defendant's conduct was "sufficiently . . . reprehensible . . . to justify a punitive damage award" where the defendant attempted more than 50 times to steal a competitor's potential clients); Bell v. Helmsley, No. 111085/001, 2003 WL 1453108, at *6 (Sup. Ct. N.Y. Cnty. Mar. 4, 2003) (punitive damages award was warranted where plaintiff endured two months of verbal abuse and three incidents of touching); Liberman v. Riverside Mem. Chapel, 225 A.D.2d 283, 291 (1st Dep't 1996) (punitive damages were warranted where defendant "acted consciously and deliberately in complete disregard of both civil and religious law" by initiating and instigating an autopsy); and Diggs v. Oscar De La Renta, 169 A.D.3d 1003, 1004 (2d Dep't 2019) (punitive damages award was not excessive for plaintiff's race discrimination and hostile work environment claims).

Defendant's cases are somewhat more comparable to the issues presented here. For instance, in Angulo v. 36th St. Hospitality LLC, plaintiff sought damages after a default judgment was entered against defendants for injuries she suffered due to sexual harassment and discrimination.  Plaintiff alleged that defendants' owner, who was not a named defendant, sexually assault and harassed her.  The court awarded a 4.98 to 1 punitive damages ratio given the "relatively short duration of" the misconduct at issue and "'the fact that the individual who actually committed the outrageous conduct'" was not before the court.  No. 19-CV-5075 (GBD) (SLC), 2020 WL 4938188, at *14 (S.D.N.Y. Jul. 31, 2020).

Finally, the Court addresses Defendant's ability to pay punitive damages.  The Court credits Defendant's business manager and accountant, Justin D. Kobay, who stated in a declaration that "Defendant made significant income in 2018-2020, mostly attributable to advances he received under his recording artist agreement."  Dkt. No. 65-3 ¶ 8.  As of the end of 2021, Defendant has not been paid royalties from the sale of his records because his advances are "significantly unrecouped."  Id.  Defendant did not tour or release new music while being incarcerated from November 2018 to August 2020 and for "1-1/2 years after his release."  Id. ¶ 10.  From January 2022 to March 2022, his total income was $27,816 and Defendant's current net monthly income is $2,318.  Id. ¶ 10-11.  "Defendant's current liabilities, including past due taxes, are greater than his assets.  Therefore, his net worth is technically less than zero."  Id. ¶ 13.  "Defendant would be rendered insolvent and would immediately have

to file for bankruptcy relief" if the Court awarded the compensatory and punitive damages Plaintiffs request.  Id. ¶ 15.

Weighing the *Gore* factors and Defendant's financial condition, the Court rejects Plaintiffs' requested punitive damages ratio as disproportionate to the facts of the case and in light of Defendant's finances.  See Patterson v. Balsamico, 440 F.3d 104, 121 (2d Cir. 2006) (reducing punitive damages from $20,000 to $10,000 for racial discrimination and a physical attack despite all *Gore* factors supporting a $20,000 award for damages given defendant's finances).  The Court also recognizes "that the comparison of punitive damages [in other cases] is 'of limited utility because each award is fact-specific.'"  Greathouse v. JHS Sec. Inc., No. 11-CV-7845 (PAE) (GWG), 2015 WL 7142850, at *9 (S.D.N.Y. Nov. 13, 2015) (quoting Chisholm v. Mem'l Sloan–Kettering Cancer Ctr., 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011)), report and recommendation adopted, 2016 WL 4523855 (S.D.N.Y. Aug. 29, 2016).  Therefore, given that the purpose of punitive damages is "to punish the defendant and to deter him and others from similar conduct in the future," Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996) (internal citation omitted), and Defendant has already spent 19 months incarcerated and four months in home confinement due to the robbery, the Court respectfully recommends a punitive damages award of $15,000 to Wonzer and $30,000 to Dozier.

3.  RICO Damages

A plaintiff bringing a RICO action may sue to recover "threefold the damages he sustains."  18 U.S.C. § 1964(c).  Awards of treble damages are appropriate upon

default judgment. Gov't Emps. Ins. Co. v. Infinity Health Prods., Ltd., No. 10-CV-5611 (JG) (JMA), 2012 WL 1427796, at *9 (E.D.N.Y. Apr. 6, 2012), report and recommendation adopted, 2012 WL 1432213 (E.D.N.Y. Apr. 25, 2012). As Defendant notes, "[a] plaintiff may not recover twice for the same injury." Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1063 (2d Cir. 1992) (holding that plaintiff could not receive a back pay award after having already received back pay damages). "When a plaintiff receives a payment from one source for an injury, defendants are entitled to a credit of that amount against any judgment obtained by the plaintiff as long as both payments represent common damages." Id. Here, Dozier seeks damages under RICO for the property stolen from him during the robbery, and emotional distress damages from the robbery. These are not "common damages," as plaintiff sought in Phelan. Accordingly, the Court respectfully recommends that Dozier be awarded treble damages under RICO in the amount of $7,500 for the monetary value of the property stolen from him - $1,500 in cash and a gold chain worth an estimated $1,000.

4. Costs to be Resolved by Way of a Bill of Costs

The Court recommends that, upon entry of an order awarding damages, Plaintiffs be granted thirty (30) days leave to file a motion for attorney's fees.

## RECOMMENDATION

For the reasons stated above, this Court respectfully recommends the following: Wonzer is awarded $15,000 in compensatory damages without leave to amend for her Medicare lien and $15,000 in punitive damages; and Dozier is awarded

$30,000 in compensatory damages without leave to amend for his Medicaid lien, $30,000 in punitive damages, and $7,500 in treble damages under RICO.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections shall be filed with the Clerk of Court and on ECF, with courtesy copies to the chambers of the undersigned, 40 Foley Square, Room 425, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Cronan.  **Failure to file objections within fourteen days will result in a waiver of objections and will preclude appellate review**.  See Thomas v. Arn, 474 U.S. 140 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: August 17, 2022
       New York, New York

Respectfully submitted,

*Jennifer E. Willis*

Jennifer E. Willis
United States Magistrate Judge